DAVID A. COMSTOCK et al. *vs.* THOMAS RAYFORD et al.

Unconnected parties, having a common interest centering in the point in issue in the cause, may unite, to obtain relief from equity, in the same bill.

C. and R. P. & Co., all non-residents of the State of Mississippi, each holding in their own right, distinct claims *v.* R. R. C., also a non-resident of this State, file a bill in chancery to subject property of R. R. C., in the hands of R., a resident of this State, to the payment of their debts—held, on demurrer, that the bill was not multifarious.

The statute on the subject of foreign attachments, (How. & Hutch. Dig. 520,) fully authorizes any creditor, with or without judgment, who can bring himself within the provisions of the statute, to file his bill and obtain relief.

Whether if all the plaintiffs and defendants to a bill in chancery in this State are non-residents the court has jurisdiction? Query?

The court of chancery in this State has jurisdiction of a bill filed by a non-resident plaintiff against a non-resident debtor, if there be also a resident defendant.

When a non-resident creditor files his bill against a non-resident debtor, under the foreign attachment law, the court cannot, at the filing of the bill, order an attachment to issue against the property in the hands of the resident defendant. That order can only be made when the home defendant has been served with process, and at the return term an affidavit is made of the absence of the other defendant; the court may then make an order for the safe keeping of the effects and their production to answer the decree.

THIS case is brought by writ of error from the decree of Joseph W. Chalmers, then vice chancellor of the northern chancery district.

The bill states that James A. Comstock, as assignee of James A. McCampbell, both of whom are complainants in the bill, obtained judgment against ReesonR. Chilton, at the April term, 1842, of the circuit court of Benton county, in the State of Alabama, for the sum of $896; that Chilton appealed to the supreme court of that State, which, on the 14th of June, 1842, affirmed the judgment with damages; that Robbins, Painter & Co., also complainants in the bill, on the 14th of April, 1841, recovered judgment in the same court, in Alabama, against the same defendant and one Pleasant H. Pearson, and one Sterling

R. Price, for $1114 $\frac{48}{100}$, from which judgment also, Chilton appealed, and the supreme court affirmed that judgment. The bill further states, that when these judgments were affirmed by the supreme court of Alabama, the defendant, Chilton, was the owner of the seven negro slaves in controversy, and had them in that State; that when the executions issuing upon the above judgments came to the hands of the sheriff of Benton county, Chilton "secretly, and for the purpose of preventing the sheriff from levying the executions on the negroes, removed and run them off" into Marshall county, in this State, where the bill alledges they then were, in the possession of the defendant, Thomas Rayford.

The bill avers that, by the laws of Alabama, the complainants had acquired a lien on the negroes in controversy, and but for the "fraudulent removal" of the negroes, they would have enforced their lien; that Chilton left no property in Alabama, and, unless the complainants succeed in subjecting these negroes, thus secretly and fraudulently run off for the purpose of cheating and defrauding the complainants, by hindering and delaying the collection of their debt, they would wholly lose their claims.

The bill farther averred, that Thomas Rayford, in whose possession the negroes were, was a citizen and resident of Marshall county, in this State, and that the negroes were placed in his hands by Chilton, to keep for his (Chilton's) use; that the complainants had been at great trouble in finding the negroes, and that from that and other circumstances, they believe, and so charge, "that the said negroes will be run from the county of Marshall as they were run from the State of Alabama, and thereby totally defeat the collection" of complainants' debts, unless the court interposed.

The bill also stated that "the said Thomas Rayford pretends that he has bought two of said negroes, Anderson and Thomas, from one Palatiah Chilton, who resides in Benton county, &c.," but that said sale was not "*bona fide* and for a valuable consideration, but only colorable for the purpose of more embarrassing" the complainants.

The bill, after specially interrogating the defendant, Rayford,

prayed for an attachment against the negroes directed to the sheriff, &c., and an injunction against Rayford from paying over any funds, or disposing of any property of Chilton's that he might owe or have, and that their debt might be satisfied out of the sale of the negroes.

The vice chancellor, upon affidavit being made to the bill, ordered the attachment and injunction to issue. The bill was filed on the 14th of October, 1842, sworn to before it was filed on the same day, and the attachment was ordered by the vice chancellor also on the same day. The clerk immediately issued the attachment, and the sheriff received it on the same day it was issued, and made the following return upon it:

"Came to hand the same day issued, and was executed by taking into my possession the within named negroes, the 15th October, 1842. - "W. EPPES, Sheriff."

The injunction also issued on the 14th of October, and was executed on the 15th, and the *subpœna* also, on the defendant, Rayford.

To this bill the defendants demurred, 1st, because the complainants upon the allegations of their bill, were not entitled to any discovery from the defendants; and 2d, because the bill was exhibited against the defendants for several distinct and independent matters and causes, which have no connection with, or relation to each other.

The vice chancellor decreed, "that the attachment in this case has been improvidently awarded; that the court had no jurisdiction of the matters in the bill contained, and that the attachment be discharged, the bill be dismissed, and the complainants pay the costs of the suit."

The cause was brought by writ of error from this decision of the vice chancellor, to this court.

*George S. Yerger*, for plaintiffs in error.

The bill in this case was filed under the chancery attachment

law, and was demurred to, and the demurrer sustained, from which an appeal was taken to this court.

The decision of the chancellor was clearly erroneous; the attachment was authorized by the chancery attachment law. How. & Hutch. Dig. 520, § 63.

Under this law, attachments for legal and equitable claims between a resident and a non-resident, or between two non-residents, have been sustained.

The Virginia and Kentucky statute is *verbatim* a copy of this. Tate's Dig. 32.    Rev. Code of Virginia, 123.

1 Cranch Rep. 282–3, reciting the Virginia statutes, and putting a construction on it.    *Loop* v. *Sumner*, 3 Randolph, 511–12. *Kennedy* v. *Brent*, 6 Cranch, 187.    3 Randolph, 94.    3 Leigh, 299.    4 H. & M. 440.    5 Munford, 178.    3 J. J. Marshall, 266. 5 Littell, 52.    3 Monroe, 406.    7 Cranch, 202.    6 Mun. 186. 6 Leigh, 285.

*H. W. Walter*, for defendants in error.

Three causes of demurrer are assigned.

1. Multifariousness.

2. Misjoinder of parties.

3. Want of jurisdiction.

We will consider the first two causes of demurrer together.

Multifariousness is the joinder of distinct matters in the same bill, and thereby confounding them, as for example, the demands of several matters distinct and unconnected against several defendants in the same bill.    Story's Eq. Pl. 224–5, 230. Mitf. Eq. Pl. by Jeremy, 181.    2. Mason, 201.    18 Ves. 80.    6 Madd. Rep. 94.    1. Tur. & Russ. 297.    Here are two Alabama judgment creditors, their interests perfectly separate and distinct, in no possible manner connected with each other, their debts contracted at different times and different places, endeavoring to enforce the collection of those debts by the same bill.

Suppose the defendants plead that the judgment of Comstock was obtained by fraud, and *nul tiel* record as to that of Robbins, Painter & Co. the evidence in the two cases must be different, and will become confounded; one may become ripe for a decis-

ion, whilst it may require years for the other to be brought to a hearing. The impolicy of this course of procedure is at once manifest, and the courts have never permitted it. 2 Sch. & Lef. 371 Hard. R. 337. Cooper, Eq. Plea, 182. Story's Eq. Plea. 225. But if both claims should be determined at the same time, will the proceeds of the negroes attached (insufficient to satisfy both, as clearly admitted by the bill,) be applied to satisfy Comstock's judgment, which was first obtained, or Robbins, Painter & Co's. whose debt was first contracted? Suppose one of the claims at the hearing is rejected, how is the cost to be apportioned? The diffculties which would result from this course of practice, demand the serious consideration of the court, and should make it lean with favor towards the simplicity of the common law. The interest of the complainants is conflicting. In the case of *Exeter College* v. *Rowland,* 6 Madd. R. 94. the Vicar and Rector joined in the same bill to enforce the collection of tithes with no conflicting interest, and with acknowledged rights, and yet the court dismissed their bill. In *Jones* v. *Garcio Del Rio,* 1 Tur. & Russ. 297, the several claimants held Peruvian scrip, and joined in the same bill to obtain an injunction restraining the payment of the money given for this scrip to the Peruvian agent, for the reason assigned in the bill, but the court dismissed it because the complainants, with distinct claims, had joined in the same suit. These cases are in point, and if applied to the case at bar, would dismiss it. See also to the same point, 2 Ves. Jr. 323, 328. 2 Sim. R. 331. Ib. 329. 2 Sim. & Stu. 79. 2 Story's Eq. § 1516. 6 J. Ch. R. 163. Cooper's Eq. Plea, 182.

But it may be contended that the cases of *Brinkerhoff* v. *Brown,* 6 John. Ch. R. 139; *Fellows* v. *Fellows,* 4 Cow. 682, and *Boyd* v. *Hoit,* 5 Paige, 65, establish a doctrine that, if applied to this case, will compel the court to sustain it. These cases recognize the principle that different judgment creditors, who have a lien on property fraudulently conveyed, may join in a bill in equity to remove any impediment thrown in the way of their lien. The judgments must have been rendered in New York, and must be a lien on property conveyed; this principle is clearly

recognized in the cases above referred to. But in this suit the appellants have no judgments in Mississippi, and consequently no lien on the property attached, as we will clearly show in the sequel. But the decisions of New York proceeded upon a statute of that State, 2 Rev. Statutes of New York, 173, 778, which gives New York judgment creditors the right of joining in the same bill (termed a creditor's bill,) against the debtor and his (fraudulent) alienee or donee. The case of *Brink* v. *Brown,* was demurred to for misjoinder of defendants more than of plaintiffs, as appears from the report of the case, and hence the statute is not mentioned in the case, although the whole of the plaintiffs were interested in the subject of the suit. We have nothing similar to the New York statutes in this State, so that these cases are inapplicable : however, they are unsupported by any English or American decision, and meet the disapprobation of Justice Story. Story's Eq. Plea. 153, 233-4, and being opposed to the first principles of law and equity should be regarded with suspicion here. We think the bill clearly defective for the first two reasons assigned by the demurrer.

Let us look at the third point raised in the case, viz. want of jurisdiction.

It is evident the appellants have no remedy at law. 6 Cow. 603. 1 Yerg. 101. 6 Ib. 473. 9 Ib. 244. 1 Ala. Rep. 14, 69. 4 Dev. N. C. Rep. 511. Story's Confl. of Law, 453. How. & Hutch. 548, 550.

But appellants in the bill, admit they have no remedy by attachment at law, and state this as the reason why equity should interfere. Can a court of equity grant this writ in this case, at common law? Can it by our statute? We answer to the first question, it cannot, and we will attempt to prove it, notwithstanding the difficulty of proving a negative in any case.

As an original or leading process, nothing like it existed by common law in chancery. An attachment was a process of contempt—a writ in the nature of a *capias* directed to the sheriff, commanding him to attach and take up the defendant, and bring him into court to answer the contempt. 3 Black. 443-4 ; if *non inventus* was returned, then an attachment with proclamations

issued; then a commission of rebellion, and finally a sequestration to seize his goods and chattels, and the profits of his real estate, and to detain them, subject to the order of the court. 3 Black. 444. " But these processes, cannot be sued out until after service of *subpœna.*" 3 Black. 445. 1 Vern. 421.

So with a *distringas,* which was a process against a body corporate, to distrain these goods, &c., until they appeared in obedience to a summons previously issued, to perform the order of the court. 3 Black. 445.

Attachments, sequestrations, and *distringas,* were only auxiliary to the ordinary process of the court, and used to punish for contempt, to carry into effect the orders of the court, &c., but were never used as leading process in a suit. See authorities from Black. above referred to.

Courts of equity acted only in *personam,* and not in *rem,* and no bill could be sustained unless all the defendants, who had any interest in the subject of the suit, had been served personally, with notice. *Grace* et al. v. *Hunt,* Cooke R. 342. *Avery* v. *Holland,* 2 Tenn. R. 76. Story's Confl. of Law, 453, 457. *Williams* v. *Ld. Bagot,* 3 Barn. & Cress. 772. *Fisher* v. *Lane* et al. 3 Wilson, 297. *Buchanan* v. *Ricker,* 9 East. 192. But the statute of 5 Geo. II. c. 25, enacts that when a defendant absconds for the purpose, (as is believed) to defeat the service of *subpœna* upon him, after publication similar to ours against absent defendants in equity, a decree may be taken, *pro confesso,* against him. But neither this statute nor ours authorizes this extraordinary process of attachment. In a late English case, the creditor filed a bill against the trustee of his absent debtor, to subject the trust estate to the satisfaction of his debt; but the court dismissed the bill because the debtor was not personally served with process, and thus made party defendant to the bill. The debtor was on the continent, and the creditor was thus defeated in his remedy.

But why did not the creditor resort to attachment in this case? Simply because such a course of procedure was unknown to the common law. But why was the introduction of attachments even at law, against absent defendants, by the colonial

governments,·opposed with so much determination ?   Why did
the governors complain so bitterly of these laws ?   Why were
royal instructions given these very governors to refuse their as-
sent to these laws ?   And why did the British government re-
sist every attempt to pass them ?   Because they were repugnant
to the spirit and practice of the common law.   2 Martin's His-
tory of N. C. 302.   In France, foreigners are not permitted
(even when within her jurisdiction) to litigate their rights in hèr
courts. ,  Story's Confl. of Law, 453.   The case of *Grace* v.
*Hunt,* Cooke's Rep. 342, determined that a court of equity
should not act in a case where the parties were non-residents ;
and the court in that case, said that " neither the plaintiff, the
ancestor, nor the heir, ever lived in this State, and these points
being pleaded in abatement, must be allowed." In *Avery* v.
*Holland,* 2 Tenn. R. 76, Overton, justice, says : " the first idea
that occurred upon reading the pleadings in this case, was the sin-
gularity of the circumstance of finding two citizens of another
State before this court, upon a contract made in their own State.
Upon this ground alone, I should be strongly inclined to think
we should not take cognizance of it." And the court dismissed
the bill on this ground, although the property, the subject mat-
ter of the suit, was in that State.   See Story's Confl. of Law,
453.

But the case of *Gasget & Co* v. *Scott, Tract* et al. 9 Yer. 244,
must forever settle this question.   Gasget & Co. citizens of Lou-
isiana, held a debt against Scott & Tract, non-residents of Ten-
nessee.   S. & T. became insolvent, and Tract, for the purpose
of defeating the collection of this debt, fraudulently, and with-
out consideration, conveyed to his co-defendants, his sons-in-law,
citizens of Tennessee, the property in controversy.   Bill prayed
that the property, by decree of the court, should be subjected to
the payment of the debt.   The court dismissed the bill, for the
reason that the parties were non-residents, and in the most ex-
plicit manner, disclaimed any jurisdiction in the case.   They
speak of the attachment laws of the State, as innovations upon
the common law, as being unknown to it, and violative of one
of its grand fundamental maxims.   The able and lucid argu-

ment of the court, on this point, commends itself to the appro-
bation of every thinking mind, and richly and amply rewards
an investigation of the above case. But this court has declared
that this proceeding is an extraordinary one. 5 How. R. 298,
has declared that the statute must be implicitly followed, and
has recognized the fact by its decisions, that it is a proceed-
ing unknown to the common law. The whole tenor of Ameri-
can decisions, by confining the process strictly within the limits
of these statutes, and to the persons named therein, have recog-
nized the same facts. In the English courts, no cases like the
present have been adjudicated, because it would be violative of
that principle of the common law, which declares that no man
shall be deprived of his property by the judgment of a court, with-
out personal notice that he has been impleaded therein. But pub-
lic policy and justice, also, condemn this course of practice. Here
are parties litigant, who owe no allegiance to our State govern-
ment, who are not amenable to its laws, who bear no part of
the burthen of its citizens, who pay nothing to the support of its
judicial officers, but who occupy, by this course of procedure,
the time of our tribunals, to the exclusion of our own citizens,
and who finally ask for the exercise of process calculated to dis-
turb the peace of community; process unknown to, and un-
sanctioned by, the common law; and process the most summary
and extraordinary known to our courts. Public policy discards
this course of practice. But it is equally repugnant to equity
and justice. Sustain this case and what will be the result?
Creditors in other States will leave their debtors at home unmo-
lested, and resort to our courts of equity for redress, by attach-
ing property here. Why? Perhaps they may think they can
enforce their claims more speedily under our laws than their
own; perhaps our statutes of limitations may be more favorable
than theirs; perhaps our rules of evidence may be more favora-
ble; perhaps their costs may be lighter, if defeated; perhaps
their claims may be fraudulent, and if defended would be de-
feated; but under the hope that our miserable statutory apology
for a notice, may escape the eye of the defendant, and thus en-
able them to take a *pro confesso,* and enforce a fraudulent claim,

and, by so doing, prostitute our tribunals, to aid in their efforts of fraud and injustice.   You will thus compel the innocent debtor to leave his State, incur the expense of defending a suit at an inconvenient distance from home, forego the benefits of those laws, with an eye to which, his debt was contracted, or else suffer injustice at the hands of tribunals created for the purpose of preventing it.   To our own citizens this privilege is granted, because the State will not compel him to travel over the Union to find his debtor who may have absconded, or be moving from one State to another.   To a citizen of another State, against an absconding debtor from this, the right is granted, because his debt was most probably contracted here, and with reference to our laws, or because the debtor once resided here, most of his property may still be here.   But to extend this rule further, would be elevating ourselves above the legislature in giving a redress, which it in wisdom has refused.   It may be urged that property will accumulate in this State in the possession of agents of unjust debtors, if this remedy is not granted. But this will seldom be the case when the creditor is vigilant and watchful, and enforces the remedies guaranteed by the State laws of the debtor's domicil.   Even in the case at bar, if the creditor had seen that proper security on the appeal bond had been given, (which they alledge became insolvent two months after being given,) no resort to this most summary and extraordinary remedy in our courts, would have been asked.   The evils of the opposite course of practice preponderate, and the court should weigh well the expediency of adopting a practice violative of the common law, and attended with so much hardship and injustice.

We have thus shown that this remedy does not lay in equity by the rules of the common law.   But does it by our statutes? Clearly not.   We have no statute which authorizes attachment in equity.   The statute defining the mode of proceeding against absent defendants having property in this state, does not, even by the most forced construction, authorize the issuance of attachments.   It provides that if the appearance of the absent defendants be not entered, (entered to what? certainly to a bill previ-

Comstock et al. *v.* Rayford et al.

ously filed,) and security given to perform the decree of the court, then upon affidavit that such defendants are out of the State, or that upon inquiry at his, her, or their place of abode, he, she, or they could not be found so as to be served with process, in all such cases the court may order the defendants in this State (possessing the effects of the absent defendants,) to give security against conveying away, or paying the effects in their hands, and for that purpose may order such debts to be paid to the plaintiff, or such effects to be delivered to them upon their giving security, &c., or a receiver may be appointed if security be not given. The word attachment is not mentioned in this statute, certainly not authorized by it. But the appellants have not in any particular followed the statute, indeed do not appear to rely on it at all, for they pray for an attachment which is not mentioned by it. But if even this enactment did authorize attachments, still it does not embrace the present parties. It was pass-ed June 7, 1822, How. & Hutch. 520, and on the 22d of the same month the same legislature passed the general attachment law, How. and Hutch. 548, 550. This statute is restrictive as to parties, confining its operation to citizens against non-resident or absconding debtors, and to non-resident creditors against absconding debtors only. Did the legislature design giving to absent creditors a remedy in equity which was denied them at law? We think not. If the appellants rely upon the statute of 7th June, 1822, then we must compare it with that of the 22d of the same month, according to the rule, that " several acts in *pari materia*, and relating to the same subject, are to be taken together and compared in their construction." Kent's Com. 462. 1 Burr. 445. Doug. 27. 4 Bacon, 647. 1 Munf. 206. 1 Tuck. Com. 13. However, the statute 9th December, 1830, Laws of Miss. 301, amendatory to that of June 7th, 1822, re-moves all doubt on this subject. That statute extends the remedy previously given by the statute June 7th, 1822, to all cases of indebtedness to any person or persons resident in the State of Mississippi, or to any body politic located therein against the property of corporations located without the State. Still nothing is said about attachments, and not the most distant intimation is given

that the legislature was speaking about attachments.   But if a forced construction is given to this statute and this bill sustained, then non-resident creditors may have a remedy in equity by attachment against their personal non-resident debtors, but not against corporations located without the State, thus placing them in a better situation than individuals, a construction not warranted by the history of past legislation in Mississippi.   But further, if this bill is sustained, you place non-residents in a better situation than our own citizens.   Upon a claim purely legal, they may resort to a court of equity without a State judgment to set aside fraudulent sales, when our citizens would be compelled to proceed first at law for a judgment, and finally, to obtain complete justice, be compelled to resort to a court of equity.   But the appellants claim this right by implication; a right violative of the common law cannot be thus raised.   1 Kent, 463.   We think we have clearly shown that this bill cannot be sustained by the common law or by statute; that it is violative of the first, and unwarranted by the last; that it is against public policy, and would operate most harshly and unjustly.

But it may be said that the case of *Williamson* et al. v. *Bowie* et al., 6 Munf. 176, furnishes a precedent for the present suit. It does not, for it was decided under an old statute of 1744. And further, the remedy by attachment, in Virginia, is much more restrictive at law than in Mississippi, confining its operations to citizens against absconding debtors.   Their own citizens must resort to equity against non-resident debtors, and the same statute that gives them this privilege, extends it also to non-residents.   If this case was decided independent of statutory provision, it is the only one so decided in the whole history of English or American Jurisprudence, and for this reason, independent of those urged generally above, should not be a precedent for this court.   By inattention and negligence the appellants lost their remedy in Alabama, and cannot with justice call upon our courts to aid them by the most summary, extraordinary, and imperative process known in its practice; a process wisely given by our legislature to few persons in but few

instances.　We have thus disposed of the question of this court's jurisdiction by attachment.

But appellants in this bill lay much stress on the allegation, that they, by virtue of their Alabama judgment, have a lien on this property, and that a court of equity should enforce that lien.　They seem to rely on this as though it possessed some latent virtue that would save them from defeat.　Suppose their judgment does possess a lien on this property, still they have no right to call on our courts of equity for this extraordinary process : possibly they might sue as suitors ordinarily do in courts of equity, but never can they embrace a remedy that is seldom permitted our own citizens, and universally disapprobated by the common law.　But they possess no lien.　If they did it might affect the objection taken to this bill for multifariousness, but not that to the jurisdiction of the court by attachment.　For this reason, and because the doctrine is novel in its character, and dangerous in its tendencies, we will give it a brief notice.　Appellants obtained judgment in Alabama, executions issued thereon, and were placed in the hands of the sheriff, when they became a lien on the negroes attached.　Immediately thereafter, and before levy, the negroes were run to Mississippi, and part of them sold to Rayford, one of appellees.　Does the lien which existed in Alabama, exists also in Mississippi ?　We think not. A lien is not in strictness either a right *in rem* or a right *ad rem ;* but merely the right to take and retain certain property until it is freed from a certain charge.　1 Story's Com. on Eq. 410.　2 P. William, 491.　2 Kent, 117, 406.　What right have the appellants either to take or to retain this property in this State ?　If they should become possessed of these negroes here, and R. R. Chilton should institute an action for detinue or trover for them, would their Alabama judgment or execution be any protection to them ?　Certainly not.　They are both inoperative here, and must receive the sanction of our courts, and changed into Mississippi judgments and executions before they can be enforced. Then upon what do appellants rely for their lien ?　Their Alabama judgment is conclusive evidence of debt here, but nothing more, and their execution is a perfect nullity.　And yet they

occupy the anomalous position of men claiming property when their title to that property is null and void. The cause has ceased, yet the effect exists! the principle is destroyed, yet the incident remains!! the tree is blasted, yet the fruit ripens!!! This is logic borrowed from the transcendentalist, it is so cogent, so plausible. They do not ask this court to give a remedy, but to create a right. The court must see at a glance how fallacious and ridiculous is this claim.

Story, after a labored investigation, at page 336 of his Conflict of Law, comes to the conclusion, that a lien, having attached *in rem*, by operation of contract, ought not to be displaced by the mere change of the local situation of the prospects. But he says, at the same page, that this must be understood of liens created by operation of contract, *inter vivos*, and not to involuntary liens or transfers by operation of law. He contends, that giving the same effect to the latter as the former, would be enforcing the statutes of a State exterritorily, would enable a State to legislate for its sovereign independent neighbor. Story Conf. of Law, 269, 336, 346. 2 Kent, 117, 406. The same authorities show that even an absolute statutory assignment *in invitium*, will not operate a transfer of that property beyond the territorial jurisdiction of the statute. An administrator is appointed in Tennessee; this operates an absolute transfer of the personalty to him. After his appointment, but before he obtains possession of the personal property of his intestate, a portion of it is carried to this State. Before taking out letters of administration in this State, he cannot institute a suit for the recovery of that property here. 1 Cranch, 259. 3 Cranch, 319. 1 Johns. Ch. R. 153. Why? Because it is a statutory involuntary transfer, which cannot operate exterritorially. But if an absolute transfer is disregarded, much more will be a mere statutory lien. Had it been affected *inter vivos, inter volentes*, or by the common law, it would have been regarded. But, further, the giving effect here to judgment liens of another State, would work an injury to our own citizens. A judgment debtor of Tennessee brings a portion of his personal property to this State and sells it *bona fide* to one of our citizens, intending at the time to apply the proceeds of

sale to the satisfaction of his Tennessee judgment. He after-
wards changes his determination, pockets the money, and suf-
fers his innocent vendee in this State to lose the property by
the judgment lien of Tennessee. Perhaps half the property in
this State, may at sometime have been under a lien of this kind
in some other State; from fortuitous circumstances the judg-
ments may be unsatisfied; and if this court sustains the lien,
the landmarks of personal property will be completely obliter-
ated and our citizens involved in interminable litigation. Courts
of one government will not give effect to the territorial laws of
another, when they will operate an injury to the citizens of the
former. 1 Hub. Lib. 1 tit. 3 de conf. § 2. 5 East. 131. 6 Pick.
269, 313, 315. 6 Bun. 353. 14 Martin's La. Rep. 67–103. 17
Mass. 110. Story Conf. of Law, 33. 1 Rand. 23. But it is
immaterial, whether a lien exist or not. If appellants are not
entitled to an attachment, their lien, (if they possess one,) cannot
aid them; if they are entitled to the attachment, the absence
of the lien will be no disservice.

But, still further, creditors at large and before judgment, have
no power in equity to interfere with the frauds of the creditors.
*Harrison* v. *Battle,* Dev. Eq. R. 537. *Wiggins* v. *Armstrong,* 2
Johns. Ch. R. 144. *Saunders* v. *Alexander,* 2 J. J. Marsh. 301.
2 McCord's Rep. 410. 2 Amer. Eq. Dig. 41–2. 3 Munf. 521.
Littell, 427. Appellants in this case, are but creditors at large,
their Alabama judgments being only better evidence of their
debts than creditors usually have.

We have devoted some time to the investigation of this case,
because it is novel and important; and our only apology for not
referring to more authorities on the point of jurisdiction by at-
tachment, must be, that but few cases like the present. have
been decided in the American courts, and none are to be found
in the whole history of English jurisprudence.

Mr. Justice CLAYTON delivered the opinion of the court.

This was a bill filed by two distinct sets of complainants, Com-
stock, and Robbins, Painter & Co, all of whom are non-residents,
against one Reesin R. Chilton, who is also a non-resident of this

State, and Thomas Rayford, who resides in this State.   It was filed to subject certain slaves in the bill described, alledged to be the property of Chilton, and in the hands of Rayford, the resident defendant, to the payment of debts due the complainants in separate rights.   These debts were ripened into judgments in Alabama, but there is no judgment upon them in this State. The bill farther alledges, that after the rendition of the judgments in Alabama, and after the judgment lien had attached, the slaves in question were brought by Chilton to this State, and placed in the hands of Rayford, to be kept for him.   The slaves are seven in number, to five of which it is said Rayford makes no claim, but sets up claim to two, under a sale which the bill charges to be colorable, and not for valuable consideration, and that he has never paid any thing for them.   An attachment was obtained to stay the effects in the hands of Rayford, the resident defendant.

To this bill a demurrer was filed, which was sustained by the vice chancellor, and the bill dismissed, because the court had no jurisdiction, and because the attachment was improperly awarded.   From this decree the case is brought to this court for revision.

We will proceed to consider the several grounds taken in support of the decree, in a brief of the counsel for the appellees, which is marked by very considerable research and ability.

The first reason relied on is, that the bill is multifarious, and joins distinct matters in separate rights.   There is no doubt that this objection, when it properly applies to a bill, is fatal; but it is not always easy to determine when a bill is or is not liable to the objection.   The difficulty is inherent in the nature of the rule itself.   It appears to be well settled, as a modification of the rule, that unconnected parties, having a common interest centering in the point in issue in the cause, may unite in the same bill.   This is allowed to prevent multiplicity of suits, an evil quite as much to be avoided as multifariousness in the same suit.   *Brinkerhoff* v. *Brown*, 6 Johns. Ch.   2 Anstruther, 469. 4 Cowen, 697.   That great master of equity pleading, Lord Redsdale, thus laid down the rule:   "Where there is a general

right claimed by the bill, and covering the whole case, it will not be regarded as multifarious, though the defendants have separate and distinct rights." *Whaley* v. *Dawson*, 2 Sch. & Lef. 367. 1 Ath. 282. In the case before us, the complainants are creditors of the same party, seeking to subject the same fund belonging to the same person. There is then a connected interest in the same point; the uniting in the suit produces no confusion or complexity in the defence, and it seems to prevent multiplicity of suits. We think, therefore, this objection cannot be sustained.

We adopt this conclusion the more readily, because under the statute in Virginia, from which ours appears to be exactly copied, it is the uniform practice to allow no priority, but to distribute the funds ratably. This is done on the elementary principle, that equality is equity. At some stage of the proceedings, the claims of the creditors have to be considered in connection; and we see no reason why it should not be done before decree, as well as afterwards. See Tate's Dig. 33, n. We think it will be proper to give the same construction and effect to our statute, unless some one of the creditors has a lien prior to that growing out of the proceeding, in which event such lien would not be divested.

It is next insisted that the complainants have no judgments in this State; that they are mere creditors at large, and that without judgment they cannot invoke the aid of a court of equity, to set aside a conveyance for fraud. We shall lay out of consideration the fact, that the complainants had obtained judgments in Alabama, and shall not attempt to say what weight they are entitled to. We do this because we believe that the statute under which this proceeding is had, fully authorizes any creditor, without judgment, who can bring himself within its provisions, to file his bill and obtain relief. See How. & Hutch. 520. The common law rule was no doubt such as the counsel for the appellee contends that it was. But under statutes in every respect like ours, courts of the very highest grade and respectability, have sustained proceedings by creditors, who had obtained no judgments at law. *Gibson* v. *White*, 3 Mun. 94.

*Wilson* v. *Koontz*, 7 Cranch, 202.   *Kelso* v. *Blackburn*, 3 Leigh, 300.   Indeed, the very end and object of the statute would be frustrated, if a previous judgment at law in this State were required, since if the party had a judgment he might proceed to lay his execution on the property at once, or proceed by process of garnishment against the debtor.   It was to provide another and additional remedy that the statute was passed, and we can only give effect to it by permitting creditors without judgment to have the benefit of its provisions.

We are referred to the case of *Gasget & Co.* v. *Scott* et al., 9 Yerger, 246, to show that this bill cannot be sustained even under the statute.   That case arose and was decided upon the act of assembly of Tennessee, passed in 1832; by comparing that act as set out in the opinion of the court with ours, which is to be found in H. & H. p. 250, § 63, it will be found that they scarcely possess a single feature in common.   So fully convinced was the legislature of Tennessee of the necessity and propriety of such a law as ours, that they, in 1836, the same year in which that decision was made, passed a law with provisions very closely resembling ours, but extending the remedy still farther in several important particulars.   Since the passage of that act, it would scarcely be doubted that the bill would lie.   Acts of 1836, p. 143.

But this bill is not filed alone, with a view to set aside a fraudulent conveyance, even if that be one of its objects, which is not certain.   The bill charges that five of the negroes were holden by Rayford for Chilton, and that the other two, if purchased, had not been paid for.   A decree may then be made for the specific delivery of those held in trust, and the payment of the money due for the others, without any reference to the question of fraud.   The demurrer admits the truth of these charges, and thus affords ground of jurisdiction, even if it could not be entertained on the principles just laid down.   We believe, however, that under the statute, the bill may be sustained upon either or both grounds.

It is next insisted that when both parties are non-residents, the court has no jurisdiction, and they cannot call upon the tri-

Comstock et al. *v.* Rayford et al.

bunals of this State to settle their disputes. This position upon the law, independent of statutory enactments in this State, may be correct, though it is not necessary for us to inquire into that point. But its application is not apparent, because in this, and all similar proceedings, there are at least two parties defendants, one of whom must reside in this State, and the other be an absentee. The principle, then, if it exists in the utmost latitude, does not apply; for the contest is not between non-residents, but between a non-resident plaintiff, and an absent and a home defendant.

The statute is in its terms too plain to be doubtful; yet authority may be found to warrant our construction. The statute is an exact copy of one which has existed in Virginia since 1744, and their courts have uniformly held that a non-resident complainant might proceed under it, against a non-resident debtor, provided there was also a resident defendant. *Williamson* v. *Bowie*, 6 Mun. 176. 3 Leigh, 306. 3 Mun. 94. The same construction has been placed upon the act by the supreme court of the United States, in reference to the District of Columbia. 7 Cranch, 202. Kentucky has the same, or a very similar act. Their court, in placing a construction upon it, uses this explicit language: "The proceeding against defendants who may be out of the country, lies as well for those who are not residents of this State, as for those who are, and as well against those who never were, as against those who were or have been." 3 Marshall, 266.

It is insisted, lastly, that a court or judge has no right, at the time of the filing of the bill, to direct an attachment to issue. Upon this point we have felt some difficulty, but after a careful examination of the statute, we believe the position is correct. By the practice in the State from which we borrowed the statute, a *subpœna* in chancery, indorsed by the clerk, " that it is to stop the debts and effects of the absent defendant, in the hands of the defendant within the State, to satisfy a debt due from the absentee to the complainant," when served, operates as an attachment or garnishment, and restrains any transfer by the home defendant. If he afterwards puts the property or effects

out of his hands, he renders himself liable.   6 Mon. 176.   *Kennedy* v. *Brent*, 6 Cra. 187.   But when the home defendant has been served with process, and at the return time an affidavit is made as to the absence of the other defendant, the court may then make an order for the safe keeping of the effects, and require surety for their production to answer the decree, or may direct them to be delivered to the complainant upon his giving surety for the return, as the court may direct.   From the issuance of the process till the return term of the court, the complainant has only a remedy against the home defendant, if he makes way with the property or effects; but at that time the court may require surety of such defendant, or make such other order as it may deem just.   The order discharging the attachment was therefore correct; but, at the same time, the court should have made a farther order to insure the delivery of the property to answer the final decree.

Before a final decree, the court must be satisfied that the complainant has established his claim against the absent defendant; a decree must then be entered therefor.   If the resident defendant by his answer denies an indebtedness, or claims the property—or denies having property of the absentee—the court must proceed to decide upon the facts, as in case of other disputed facts, and decree accordingly.

The order of the Vice Chancellor, in sustaining the demurrer, and dismissing the bill, will be reversed, and the cause remanded for further proceedings, in consonance with the principles herein laid down.   The order discharging the attachment is affirmed, but the court below should make such further order as may be necessary to preserve the fund during the pendency of the suit.

We do not mean to express any opinion, which would prejudice the right of a party to obtain an injunction, to prevent the transfer or removal of the property upon a proper case, at the time of the bill filed.

*Decree reversed, with costs.*